IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM DAL MOLIN and CHRIS MALAN,<br><br>        Plaintiffs,<br><br>  v.<br><br>COUNTY OF NAPA CONSERVATION, DEVELOPMENT & PLANNING DEPARTMENT; ED COLBY; COUNTY OF NAPA DISTRICT ATTORNEY'S OFFICE; RICHARD ZIMMERMAN; and Does 1 through 50, inclusive,<br><br>        Defendants. | No. C 04-03879 WHA<br><br>**ORDER DISMISSING CLAIMS OF CHRIS MALAN AND GRANTING SUMMARY JUDGMENT** |

## INTRODUCTION

In this action alleging a violation of 42 U.S.C. 1983, defendants now move for summary judgment. This order finds that Chris Malan has suffered no injury and therefore lacks standing to bring suit. Accordingly, her claims are **DISMISSED**. In addition, defendants' motion for summary judgment is **GRANTED**.

## STATEMENT

Plaintiff William Dal Molin bought an undeveloped parcel of land in St. Helena, in the heart of Napa Valley. Dal Molin wanted to build a road on this property and proceeded to do so without a permit, allegedly because he thought he was exempt. He was criminally prosecuted in

1 state court for earthmoving, grading and improvement obtaining a permit or filing an erosion
2 control plan.[1]

3       This order will briefly review the underlying facts.  Dal Molin first visited the Napa
4 County Department of Conservation Development and Planning ("Planning Department") in
5 April of 2002, while he was still in escrow on the property.  Planning technician Naomi Beattie
6 testified that she advised Dal Molin that, because the proposed road was so long and steep, an
7 Erosion Control Plan ("ECP") would be necessary; she gave him the appropriate application
8 forms (Beierle Exh. B at 35:17–37:2).  She also noted a potential problem because "Napa
9 County's policy is not to allow roads to no where," meaning that any road must "be affiliated
10 with an agricultural project or structural project" (*id.* at 35:20–25).  Dal Molin did not file an
11 ECP at that time, however, testifying that he was told he was "cleared" to put a road in (Beierle
12 Exh. A at 17:11–23).  He further indicated that Larry Bogner at the Department of Public
13 Works had confirmed he did not need a grading permit to improve his property (*id.* at
14 21:26–22:15).  Work on the road began on July 4, 2002 (*id.* at 22:16–17).

15       On July 5, 2002, defendant Ed Colby, an employee of the Planning Department, visited
16 Dal Molin's property in response to a neighbor's complaint.  Colby observed a freshly cut road
17 and heard the operation of heavy equipment, suggesting that construction was in progress
18 (Beierle Exh. C at 28:22–31:3).  It was his opinion that this was a violation of Napa County
19 Code § 18.108.070(B) and he left a "red tag" — *i.e.*, an order to comply, requiring Dal Molin to
20 cease grading and to file an ECP as soon as possible (*id.* at 32:10–33:15).  That same day,
21 plaintiff called to explain that he had already been "given a go-ahead" (*id.* at 33:16–34:12).

22       On July 8, 2002, Dal Molin returned to the Planning Department in person, at which
23 time he spoke with both Colby and Bogner.  Bogner denied telling Dal Molin that he was
24 exempt from filing an ECP; in fact, he would have had no authority in that regard because the
25 Department of Public Works is completely separate from the Planning Department (*id.* at

---

28    [1] In 1991, Napa County enacted "Conservation Regulations" to protect lands from excessive soil loss and maintain or improve water quality of watercourses by minimizing soil erosion from earthmoving, land-disturbing and grading activities.

2

37:7–38:3). Dal Molin allegedly told Colby that he was not going to cease his project (*id.* at 38:18–23; Beierle Exh. F at 59:5–12).

On July 9, 2002, Colby sent a written notice of violation to Dal Molin, giving him thirty days to file a complete and acceptable ECP with the Planning Department (Beierle Exh. G). Dal Molin was warned that failure to do so would "result in the issuance of [a]dministrative [c]itations and/or referral to the District Attorney for action on their part" (*ibid.*).

On August 16, 2002, plaintiff's attorney Mark Pollack wrote a letter commemorating a discussion he had that day with Patrick Lynch of the Planning Department (Beierle Exh. H). Therein, he indicated that plaintiff's ECP was still being prepared by Drew Aspergin, but interim erosion control measures could be implemented by Douglas Nix of Osterling Oversite (*ibid.*). It was agreed that these measures would not violate the red tag order of July 5, 2002.

On August 27, 2002, Colby received a call from Randy Bryant, who said that Dal Molin's road had been "base rocked" (Beierle Exh. F at 100:6–21).[2] Although Colby testified during his deposition that this "verified the fact that [Dal Molin] continued with work after being told he should not continue," he admitted that he did not know whether the base rock was placed as an erosion control measure, at the direction of Nix (*id.* at 100:22–101:8).[3] On September 9, 2002, the neighbor who originally complained called to report that the road was now "blacktopped," meaning it was fully-paved (Miller Exh. 3 at 2).

On September 24, 2002, Dal Molin submitted an ECP, but it did not include building plans for a residence (Beierle Exh. F at 101:9–23). Mary Doyle at the Planning Department concurred that the ECP was "incomplete for planning purposes" because it was a "single page as-built" that merely described what was already on the ground, not a "pre-construction" erosion control plan (Beierle Exh. J at 24:12–22; Miller Exh. 12).

---

[2] As the name suggests, base rock is placed as a foundation layer that stabilizes the surface of the road.

[3] In the state criminal proceeding, Nix submitted a declaration in which he indicated that he "never approved any further construction of the road" and, in fact, did not review or approve any erosion control measures until November 4, 2002 (Beierle Exh. I at 2). In a letter to Dal Molin, dated December 20, 2002, Nix confirmed that "[a]t the time of our meeting [on November 4], the driveway was complete and had been paved" (Miller Exh. 8).

3

On December 9, 2002, Steve Lederer of the Planning Department wrote a letter commemorating a discussion between Dal Molin, Colby and himself that day (Beierle Exh. K). Therein, he reiterated that the road "on the subject property was completed without an erosion control plan." Lederer also clarified that the subsequently submitted ECP was considered "incomplete for various technical reasons, one of which being that the purpose of the road is unclear." Apparently, Dal Molin had previously indicated that the road was intended to support a future agricultural use, but now claimed that it was for residential use; Lederer indicated that the ECP "should be revised to clearly show this planned use." He further warned that even if the ECP were approved, the residential building plans would have to be submitted within six months of approval or the County would request removal of the road and restoration of the land to its previous undisturbed condition (*ibid.*).

                          *   *   *

On October 3, 2002, Colby sent a request for legal action to defendant Richard Zimmerman at the Napa County District Attorney's Office (Miller Exh. 3). Therein, he detailed the events leading up to his recommendation to initiate legal proceedings against the property owner (*id.* at 1-2). He included the following sentence at the end of his memorandum: "FYI William Dal Molin is Chris Malan's father!!!!!!" (*id.* at 3).[4] When questioned about this during his deposition, Colby indicated that he merely thought it was "superbly ironic that the father of a well-known environmentalist in Napa County was caught violating code related to grading which is her big issue," but this fact had no influence on his treatment of the case (Beierle Exh. F at 104:20–105:12). At trial, he denied wanting "to poke back at Chris Malan," explaining that he did not consider her an "opponent" because her interests in enforcing the conservation regulations were aligned with those of the Planning Department (Beierle Exh. P at 17:2–13).

Dal Molin's daughter, plaintiff Chris Malan, describes herself as an environmental activist (Malan Decl. ¶ 6). She alleges that Zimmerman never followed up on any of *her* reports of "violators of the hillside ordinances;" she claims that her father is the only person ever

---

[4] Lynch, Colby's supervisor at the Planning Department, testified that at trial that he would not have "done it that way" himself, but it was just matter of stylistic preference (Miller Exh. 7 at 196:26–197:3).

4

criminally prosecuted, "despite there having been hundreds of complaints" to the Planning Department about other individuals (*id.* ¶¶ 3–4). She believes that the criminal prosecution of her father was intended to "seek revenge for and negatively impact [her] successful environmental efforts" (*id.* ¶ 5). She contends that defendants' actions have caused her entire family "significant emotional distress, anxiety, humiliation, and reputation damage" (*ibid.*).

Specifically, she notes that Jeff Schechtman, a talk show host for Napa radio station KVON, made Dal Molin's referral to the District Attorney's office for constructing an illegal road the subject of his radio show on October 7, 2002 (*id.* ¶ 7). Plaintiffs assert that the referral "was not public record and could only have been leaked to the media by defendants" (Opp. 7).[5] Malan further alleges that the District Attorney's investigation into her father's allegedly illegal road was "continuously and aggressively used negatively" to attack her during a 2003 political campaign concerning the Napa County Conservation Regulations (*id.* ¶ 8).

Of the approximately twelve to fifteen complaints received by the Planning Department in the time period from summer 2001 to summer 2002, probably two or three were referred to the District Attorney (Beierle Exh. F at 45:20–46:16). Once a case is referred, the Planning Department is no longer involved in the decision whether to initiate legal proceedings against the alleged offenders (*id.* at 61:16–62:11). Indeed, Colby testified that while "[t]he D.A. might ask us to make another inspection to update if it's been a few months before they can get to the case," generally they forwarded "everything, even inquiries" to the District Attorney (*id.* at 61:11–15). For example, on December 17, 2002, when Colby was contacted by Mark van Gorder about his willingness to testify that he observed continued construction on Dal Molin's property, he dutifully forwarded this information to Zimmerman (Miller Exhs. 15–16).

In a declaration filed for the state criminal proceeding, Zimmerman indicated that he had "an impartial opinion of Ms. Malan" and bore "no ill will" towards her (Beierle Exh. N at 2).

---

[5] Plaintiffs cite no evidence in support of this contention. The only evidence in the record concerning this issue was Pollack [Dal Molin's attorney] testifying at trial that *his* office did not have any contact with the radio station (Miller Exh. 4 at 381:12–15). From this, plaintiffs jump to the conclusion that defendants must have "leaked" the news. Yet, Schechtman testified at his deposition that he had never had a discussion with Zimmerman (or anyone else from the District Attorney's office) about either Malan or Dal Molin; moreover, he did not even know who Colby was (Beierle Exh. Q at 16:15–17:12). In any event, Schechtman is not a state actor and is not a party to this action.

5

1  He elaborated that his "review of the referral and decision to file a complaint were entirely
2  impartial and based solely on the facts available to [him] and the nature of the violations;" he
3  specifically declared that "[n]either the familial relationship between the defendant and
4  Ms. Malan nor any apparent public controversy had any bearing on [his] decision" (*ibid.*).

The criminal complaint was filed in the Superior Court of Napa County on July 3, 2003 (Beierle Exh. M). On January 15, 2004, a jury returned verdicts of "Not Guilty" on all counts (Beierle Exh. O). This lawsuit followed.

The complaint, filed on September 15, 2004, alleges a single cause of action: a violation of 42 U.S.C. 1983.[6] Specifically, plaintiffs "allege that they were subjected to a violation of their constitutional rights to free speech, association, right to petition government, privacy, due process, equal protection, and to be free from discriminatory selective prosecution of other retaliation based upon the exercise of these rights, guaranteed by the first, fourth, fifth, and fourteenth amendments to the United States Constitution" (Compl. at 5).

Defendants now argue that plaintiff Chris Malan has no standing to sue. Defendants also move for summary judgment on the merits. Specifically, they argue that defendant Zimmerman is protected by absolute immunity for his activities relating to the criminal prosecution of plaintiff Dal Molin. In addition, defendants assert that plaintiffs have failed to identify a constitutional right that was violated as a result of any pattern, practice or policy.

**ANALYSIS**

**1.     PLAINTIFF CHRIS MALAN LACKS STANDING.**

As a threshold issue, defendants argue that plaintiff Chris Malan lacks standing. The Court agrees. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," which limits the jurisdiction of federal courts. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate standing, three elements must be

---

[6] This statute provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

6

satisfied. First, there must be an "injury-in-fact;" in other words, plaintiff has suffered a "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Second, a plaintiff must establish a causal connection between the injury and the conduct of the defendant. Third, it must be likely (as opposed to merely speculative) that a favorable decision will redress the injury. *Id.* at 560–61 (internal citations omitted). At the summary judgment stage, mere allegations of injury no longer suffice; plaintiff must set forth specific facts by affidavit or other evidence. *Id.* at 561.

Here, there is no evidence in the record that plaintiff Malan has suffered *any* injury-in-fact, much less a constitutional injury. First, she had no ownership interest in the subject property and was not personally prosecuted for violating any conservation regulations, only her father was. None of defendants' alleged actions directly affected her. Thus, even assuming *arguendo* that the criminal prosecution constituted an equal protection violation of some kind, she was not the victim. Second, although she alleges that her first amendment rights were violated, she does not allege and there is no indication in the record that the criminal prosecution of her father chilled *her* speech in anyway. Her eight-paragraph declaration was completely devoid of any allegation that she refrained from speaking, campaigning, or otherwise advocating her political causes. Third, to the extent that Malan or her father's reputation suffered as a result of Schechtman's radio broadcast, plaintiffs have failed to produce any evidence establishing a causal connection between this injury and defendants' conduct.

For these reasons, this order finds that plaintiff Malan lacks standing to bring suit. Accordingly, her claims are **DISMISSED**.

\*   \*   \*

This order now addresses whether summary judgment is appropriate with respect to plaintiff Dal Molin.

Here, the essence of the complaint appears to be an allegation of selective prosecution in violation of 42 U.S.C. 1983. This order notes that the complaint does not contain a facial challenge to the constitutionality of Napa County Code § 18.108.070(B). Rather, plaintiffs merely argue that this section was selectively enforced.

**2.    LEGAL STANDARD FOR SUMMARY JUDGMENT.**

Pursuant to FRCP 56(c), summary judgment is proper where the pleadings, discovery and affidavits show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A genuine dispute as to a material fact exists if there is sufficient evidence for a reasonable trier of fact to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party meets its initial burden of demonstrating the absence of any genuine issues of material fact, the nonmoving party must "go beyond the pleadings by [its] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (internal quotations omitted). "Evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Yet, it is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Ibid.*

**3.    PLAINTIFFS' § 1983 CLAIM OF SELECTIVE PROSECUTION FAILS.**

The defense of qualified immunity protects individual defendants Zimmerman and Colby from § 1983 liability "when performing discretionary functions, unless such conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001).[7] In analyzing whether qualified immunity applies, we look to three inquiries: (1) the identification of the specific right allegedly violated; (2) the determination of whether that right was so "clearly established" as to alert a reasonable officer to its constitutional parameters; and (3) the ultimate determination of whether a reasonable officer could have believed lawful the particular conduct at issue. *Ibid.*

---

[7] On August 1, 2005, the Court approved a stipulated dismissal of all claims against Zimmerman and Colby in their individual capacities, but not in their official capacities.

1    Whether a constitutional right has been violated is a "threshold question." *Saucier v.
2 Katz*, 533 U.S. 194, 201 (2001). Here, Dal Molin fails to clearly identify exactly what
3 constitutional right was violated. This order observes that the complaint was vaguely drafted in
4 the sense that plaintiffs alluded to multiple constitutional violations without explaining any
5 particular theory in detail. The essence of the complaint, however, appears to be an allegation
6 that Dal Molin was selectively prosecuted.[8]

7    Ordinarily, "so long as the prosecutor has probable cause to believe that the accused
8 committed an offense defined by statute, the decision whether or not to prosecute, and what
9 charge to file or bring before a grand jury, generally rests entirely in his discretion." *United
10 States v. Armstrong* 517 U.S. 456, 464 (1996)(internal citation omitted). To prevail on a
11 selective prosecution claim, a plaintiff must prove that members of an identifiable class were
12 singled out for enforcement of the law while nonmembers of the class were not prosecuted. *Id.*
13 at 465 ("The claimant must demonstrate that the . . . prosecutorial policy had a discriminatory
14 effect and that it was motivated by a discriminatory purpose."). In other words, the decision
15 whether to prosecute may not be "deliberately based upon an unjustifiable standard such as
16 race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). On
17 the other hand, "[m]ere selectivity in prosecution creates no constitutional problem." *United
18 States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972).

19    Selective prosecution claims are judged "according to ordinary equal protection
20 standards." *Wayte v. United States*, 470 U.S. 598, 608 (1985). The first step in equal protection
21 analysis is to define the classes to be compared. "The goal of identifying a similarly situated
22 class . . . is to isolate the factor allegedly subject to impermissible discrimination. The similarly
23 situated group is the control group." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th

---

[8] Despite their repeated references to "selective prosecution" and "malicious prosecution" as if these causes of action were one and the same, plaintiffs do not seem to be alleging a claim of malicious prosecution under 42 U.S.C. 1983. To succeed on such a claim, a plaintiff must demonstrate (1) tortious conduct in violation of state law and (2) intent to deprive the plaintiff of a constitutional right. *Poppell v. City of San Diego*, 149 F.3d 951, 961 (9th Cir. 1998). The elements of malicious prosecution under California law are: (1) initiation of criminal prosecution; (2) malicious motivation; and (3) lack of probable cause. *Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987). Here, plaintiffs never alleged (and have failed to present supporting evidence) that defendants initiated criminal proceedings without probable cause.

9

1  Cir. 1995)(internal citation omitted).  The next step is to determine the level of scrutiny
2  required.  Finally, the classes must be compared to show there was a discriminatory effect.

3  Here, plaintiffs have not explicitly identified what the two classes would be.  It was
4  never alleged that Dal Molin himself was attempting to exercise *his* First Amendment rights of
5  free expression; only his *daughter* is an environmental activist.  Thus, this order proceeds under
6  the assumption that Dal Molin's hypothetical class would be persons in violation of Napa
7  County Code § 18.108.070(B) who are themselves environmental activists or are intimately
8  associated with environmental activists, while the similarly-situated class would consist of all
9  other individuals allegedly in violation of that section.[9]

10  Plaintiffs initially failed to set forth any specific facts that individuals in the
11  similarly-situated class were not prosecuted for grading violations.  No motion was made under
12  FRCP 56(f) for further affidavits or depositions.  Malan merely proffered generalized and
13  conclusory allegations that Zimmerman did not follow up on *her* referrals of grading violations
14  and that "hundreds" of violations are not criminally prosecuted (Malan Decl. ¶¶ 3–4).  Yet,
15  plaintiffs did not name a single individual or identify a single parcel of land as an example.
16  Counsel was explicitly warned at oral argument that this offer of proof was grossly inadequate.

17  This order emphasizes that the deadline for fact discovery was July 8, 2005.  Plaintiffs'
18  counsel was already admonished once (during a telephone conference on July 8, 2005) for
19  waiting until the last minute to resolve discovery disputes.  At the hearing on August 4, 2004,
20  however, it was revealed that the parties had stipulated to extend their discovery deadline.
21  Although the Court did not approve of any such extension, the parties were given additional
22  time to supplement the summary-judgment record.

23  Plaintiffs have now submitted documents pertaining to all complaints made to the
24  Planning Department between 1995–2003 (Miller Exh. 17), additional deposition testimony (*id.*
25  Exhs. 18–21) and a declaration by Dal Molin.  The record reflects a system wherein the
26  Planning Department receives complaints, refers some of these to the District Attorney's office,

---

[9] By assuming this for the sake of argument, the Court is not vouching that this would be a cognizable class.  This order also declines to speculate what level of scrutiny would be appropriate for such a classification.

1    which then prosecutes some individuals but not others. At Zimmerman's deposition, plaintiffs'
2    counsel indicated that there were a total of ten referrals to the District Attorney's office during
3    this time period (Suppl. Reply Exh. 80:10–81:19). Plaintiffs' supplemental brief, however, then
4    asserted there were only five referrals out of one hundred forty-eight complaints from 1995 to
5    2003; for the particular ordinance under which Dal Molin was charged, there were only two
6    criminal prosecutions (namely, Dal Molin and Jeffrey Abbett) out of seventy complaints (Suppl.
7    Br. 2–3). Defendants disagree, stating there were twelve referrals from 1996 through 2002
8    (Suppl. Reply Br. 1). Regardless of which side counted correctly, for the purposes of this
9    motion, it is unimportant exactly how many complaints were referred or ultimately prosecuted.

10   The now-supplemented record, even when viewed in the light most favorable to
11   plaintiffs, still does not allow the inference that Colby's decisions to refer particular cases or
12   Zimmerman's decisions to prosecute were targeted only towards environmental activists or their
13   families. No reasonable jury could so find on this record. The materials submitted do not
14   identify which individuals, if any, were connected to pro-environment causes. It is undisputed
15   that Dal Molin was *not* the only individual criminally prosecuted for a violation of Napa County
16   Code § 18.108.070(B). There is no evidence that Abbett, the other such person, was himself an
17   environmental activist (or related to one). Indeed, it is impossible to determine from this record
18   whether *any* persons referred or prosecuted were members of this group. Conversely, it is also
19   impossible to determine whether everyone else was *not* in this group.

20   Zimmerman characterized Abbett's case as "a very similar situation of grading a road
21   up a hill, no water course involvement, no ECP and a single person without a business entity"
22   (Suppl. Reply Exh. 53:24–54:1). He explained that his decision whether to proceed with a civil
23   or a criminal action was governed by various considerations, although generally he preferred to
24   "go civil." First, he would determine whether it was a business entity that could be subjected to
25   liability under California Business and Professions Code § 17200 *et seq.*, under which civil
26   penalties are available. If the referral concerned an individual, then he would consider whether
27   violations of California Fish and Game Code § 1600 *et seq.* or § 5650 *et seq.* could apply, under

11

1  which a prosecutor could choose to bring charges either criminally or civilly.[10]  But, "[i]f it
2  [was] a single person, no business and no Fish and Game, [he was] limited to a criminal
3  remedy" because common law actions for negligence or nuisance were unsatisfactory
4  alternatives (*id.* at 16:10–22:18).  Both of the cases that ultimately led to criminal prosecutions
5  fell into this category.  In short, the evidence suggests that Abbett was a similarly-situated
6  individual whose case was treated exactly the same.

7  As for the issue of whether there is any proof of *Colby's* discriminatory intent, plaintiffs
8  assert that his comment to Zimmerman is "the proverbial smoking gun" (Opp. 7).  This order
9  recognizes that Colby's statement is open to interpretation.  It could reflect an improper
10 motivation for referring the case to the District Attorney's office.  On the other hand, it could be
11 simply what he claims, a mere footnote underscoring the irony of the situation.  But the key
12 point is that the record currently before the Court would not allow any reasonable jury to
13 conclude that a similarly-situated *class* was treated differently.  Because that is case-dispositive,
14 it is irrelevant what Colby's statement meant or what his intentions were.  Nor is there evidence
15 that Colby "improperly exerted pressure on the prosecutor," such that he would not be shielded
16 from liability.  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).

17                                            *     *     *

18 Summary judgment for a defendant is appropriate when the plaintiff fails to make a
19 showing sufficient to establish the existence of an element essential to that party's case, and on
20 which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  Accordingly,
21 summary judgment in favor of Zimmerman and Colby is **GRANTED**.

22 Plaintiffs likewise fail to point to evidence in the record reflecting any official policy or
23 custom of selective prosecution by the Planning Department or the District Attorney's office
24 that would be necessary to establish municipal liability.  *Monell v. Dep't of Social Services*, 436
25 U.S. 658, 690 (1978).  As such, summary judgment in favor of the municipal defendants is also
26 **GRANTED**.

---

28  [10] Plaintiffs attempt to use John Alimpic as an example of an individual, rather than a business, against whom civil charges were brought, but as Zimmerman explained, he was able to proceed under the Fish and Game sections in that case (Suppl. Reply Exh. at 73:6–75:15).

1   In light of these holdings, this order need not reach the issue of whether defendant
2   Zimmerman's decision to prosecute after Colby's referral was "intimately associated with the
3   judicial phase of the criminal process" or merely investigative.  If the former, then absolute
4   immunity would shield him from liability; if the latter, then only qualified immunity would
5   apply.  *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).  To the extent that plaintiffs are merely
6   challenging Zimmerman's decision to prosecute Dal Molin criminally, rather than civilly, this
7   would clearly be an integral part of "initiating a prosecution," protected by absolute immunity.
8   *Id.* at 431.  As explained above, however, summary judgment in defendants' favor would still
9   be appropriate even if qualified immunity applied.

## CONCLUSION

For the aforementioned reasons, plaintiff Chris Malan's claims are **DISMISSED**.
Defendants' motion for summary judgment with respect to plaintiff William Dal Molin is
**GRANTED**.  This case is now over as to all parties.  Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated:  August 17, 2005



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

13